**Linda F. HUDSON and Charles Hudson, Plaintiffs,**

v.

**HERMANN PFAUTER GmbH & CO. and Fellows Corporation, Defendants.**

**No. 85–CV–101.**

United States District Court, N.D. New York.

Sept. 9, 1987.

Armani, Fitzpatraick, Snyder & Armani, Syracuse, N.Y., for plaintiffs; Ivan O. Farquharson, of counsel.

Jaeckle, Fleischmann & Mugel, Buffalo, N.Y., Bond, Schoeneck & King, Syracuse, N.Y., for defendant Hermann Pfauter; Edward P. Yankelunas, Buffalo, N.Y., S. Paul Battaglia, Syracuse, N.Y., of counsel.

Hancock & Estabrook, Syracuse, N.Y., for defendant Fellows Corp.; David S. Howe, of counsel.

## MEMORANDUM–DECISION AND ORDER

MUNSON, Chief Judge.

Defendant Hermann Pfauter GmbH & Company ("HPG") has moved pursuant to Rule 26(c), Fed.R.Civ.P., for a protective order requiring plaintiffs to serve their interrogatories directed at HPG in accordance with the procedures prescribed by the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, *opened for signature*, March 18, 1970, 23 U.S.T. 2555, T.I.A.S. No. 7444 (reprinted at 28 U.S.C. § 1781 note) ("Hague Convention" or "Convention"). Plaintiffs wish to proceed under Rule 33 of the Federal Rules of Civil Procedure. The court finds that plaintiffs should utilize Convention procedures in obtaining answers to their interrogatories, and thus grants HPG's motion for a protective order.

## I. BACKGROUND

The complaint alleges that plaintiff Linda P. Hudson suffered personal injuries on July 14, 1982 while operating a gear hobber machine during the course of her employment at the New Process Gear Division of Chrysler Corporation in East Syracuse, New York. The machine was allegedly manufactured by HPG, and plaintiffs are pursuing negligence and strict products liability claims. HPG is a corporation formed under the laws of the Federal Republic of Germany (West Germany) which maintains its principal place of business in Ludwigsburg, West Germany.

On February 21, 1986 plaintiffs served their first set of interrogatories on HPG pursuant to Rule 33 of the Federal Rules of Civil Procedure. This set contains ninety-two interrogatories, many of which contain sub-parts. While it appears that most of these interrogatories seek relevant information,[1] they cannot be described as "unintrusive;" they seek detailed information about the design of the gear hobber machine at issue and the conduct of HPG's business affairs with respect to the sale of such machines in the United States.

By letter dated March 3, 1986 counsel for HPG objected to the interrogatories, insisting that all discovery requests of HPG be

---

1. Given the court's determination concerning the use of Hague Convention procedures in lieu of the Federal Rules as a first resort in this case, the court need not pass upon the relevance objections to Interrogatories 2(b), 5, 19(a), 20, 52, 58, 78, 83, 84, and 85.

made pursuant to the procedures outlined in the Hague Convention. In a reply letter dated March 19, 1986, plaintiffs indicated that they would not voluntarily comply with the terms of the Convention.[2] Thereafter, the motion now before the court was brought.

## II. DISCUSSION

The Hague Convention, which established certain procedures through which a judicial authority in one nation which is a signatory to the Convention may request evidence located in another signatory nation, was primarily designed "to reconcile the differing legal philosophies of the Civil Law, Common Law and other systems with respect to the taking of evidence." *Société Nationale Industrielle Aérospatiale v. United States District Court for the Southern District of Iowa,* — U.S. —, 107 S.Ct. 2542, 2559, 96 L.Ed.2d 461 (1987) (hereinafter *Société Nationale Aérospatiale* ) (Blackmun, J., concurring in part and dissenting in part) (quoting Rapport de la Commission speciale, 4 Conference de La Haye de droit international privé: Actes et documents de la Onzième session 55 (1970)). In most civil law countries, the taking of evidence from private parties falls within the province of the courts; when private parties act to secure evidence controlled by other private parties in a civil law nation without the participation or consent of that nation's authorities, the "judicial sovereignty" of the civil law country is offended. *Id.* 107 S.Ct. at 2562–63 (Blackmun, J., concurring in part and dissenting in part) (quoting 8 Int'l Legal Materials 785, 806 (1969)). The liberal provisions of the United States' Federal Rules of Civil Procedure are particularly objectionable to those civil law countries, and before the United States ratified the Hague Convention litigants in American courts seeking to obtain evidence located abroad frequently were refused the assistance of officials in the foreign nations where the evidence was located. *Id.* at 2549 (citing Amram, Explanatory Report on the Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, in S.Exec.Rep. No. 92–25, 92d Cong., 2d Sess., at VI (1972)). Thus, the Hague Convention not only serves the interest of international comity but also benefits common law countries by facilitating discovery in civil law jurisdictions without slighting the judicial sovereignty of the nations in which discovery is sought. *See Société Nationale Industrielle Aérospatiale v. United States District Court for the District of Alaska,* 788 F.2d 1408, 1411 (9th Cir.1986).

The Hague Convention provides both formal and informal techniques for the gathering of evidence. Chapter I of the Convention provides, for example, that a judicial authority in one contracting state may request the "competent authority" of another contracting state "to obtain evidence, or to perform some other judicial act." 23 U.S.T. at 2557, T.I.A.S. 7444 (*see* 28 U.S.C. § 1781 note). These formal "letters of request" can be made for documents, depositions, or interrogatories. Chapter II of the Convention establishes less formal procedures for the taking of evidence by a diplomatic or consular officer of the requesting state or by commissioners nominated by the court of the state where an action is pending. The discovery rules set forth in the Convention appear to be more cumbersome than the liberal procedures contemplated by the Federal Rules. Because of this, American courts have been reluctant to compel use of the Hague Convention procedures when foreign litigants subject to *in personam* jurisdiction in this country have objected to the use of our discovery rules. *See, e.g., Work v. Bier,* 106 F.R.D. 45, 55–56 (D.D.C.1985); *International Society for Krishna Consciousness, Inc. v. Lee,* 105 F.R.D. 435, 449–50 (S.D.N.Y.1984); *Graco, Inc. v. Kremlin, Inc.,* 101 F.R.D. 503, 509–12 (N.D.Ill.1984.).

It is well-established that the federal courts generally have the power to require discovery to proceed under the Federal Rules whenever they have jurisdiction over

---

2. HPG subsequently agreed to answer Interrogatories 2(b), 2(c)(i), 24, 25(a), 31, 32, 33, 54, and 55, since those interrogatories sought information which, if available, could be obtained both in West Germany and the United States.

the foreign party from whom discovery is sought. *Société Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers*, 357 U.S. 197, 204–06, 78 S.Ct. 1087, 1091–93, 2 L.Ed.2d 1255 (1959). In *Société Nationale Aérospatiale*, the Supreme Court was presented with the issues of whether the Hague Convention, ratified by the United States Senate after the Federal Rules were enacted, superceded the discovery provisions of the Federal Rules when discovery is sought from private parties in signatory nations, and if not, under what circumstances a federal court should refrain from exercising the full extent of its power to compel discovery under the Federal Rules when the procedures of the Hague Convention are available to litigants. In addressing the interaction between these two procedural schemes, the Supreme Court concluded that the procedures set out in the Hague Convention were "a permissive supplement ... for other means of obtaining evidence located abroad," 107 S.Ct. at 2551 (footnote omitted), and rejected the suggestion that the Convention required the use of its procedures to the exclusion of the discovery procedures provided by the Federal Rules, or even that the Convention required litigants in every case to utilize Convention procedures as a first resort before utilizing other discovery methods. *Id.* at 2553, 2555. The Court noted, however, that though the Convention by its terms does not mandate that litigants in signatory nations abide by its procedures, considerations of international comity might in some circumstances argue strongly for the utilization of Convention procedures before resort to the discovery provisions of the Federal Rules.

> [W]e have long recognized the demands of comity in suits involving foreign states, either as parties or as sovereigns with a coordinate interest in the litigation. See *Hilton v. Guyot*, 159 U.S. 113, [16 S.Ct. 139, 40 L.Ed. 95] (1895). American courts should therefore take care to demonstrate due respect for any special problem confronted by the foreign litigant on account of its nationality or the location of its operations, and for any sovereign interest expressed by a foreign state. We do not articulate specific rules to guide this delicate task of adjudication.

*Id.* at 2557 (footnote omitted).

Though the majority in *Société Nationale Aérospatiale* was reluctant to "articulate specific rules" for determining when considerations of international comity require a court, at least in the first instance, to defer to the provisions of the Hague Convention rather than allowing discovery to proceed in accordance with the Federal Rules, the court is not without guidance from other sources. In undertaking a comity analysis, the court necessarily must balance countervailing interests, and judges and scholars have identified a number of factors relevant to this balancing test. For instance, in *United States v. First National City Bank*, 396 F.2d 897 (2d Cir.1968), the Second Circuit was presented with the issue of whether a domestic bank with branches in West Germany could refuse to comply with a Grand Jury's subpoena *duces tecum* requiring production of documents in the possession of one of its West German branches on the ground that compliance would subject the bank to civil liability under West German law. In resolving this issue, the circuit court "balance[d] the national interests of the United States and Germany and [gave] appropriate weight to the hardship, if any, [the bank would] suffer." *Id.* at 902. In its comity analysis, the court specifically referred to factors set out in the Restatement (Second) of Foreign Relations Law of the United States § 40 (1965):

> (a) [the] vital national interests of each of the states,
>
> (b) the extent and the nature of the hardship that inconsistent enforcement actions would impose upon the person,
>
> (c) the extent to which the required conduct is to take place in the territory of the other state,
>
> (d) the nationality of the person, and
>
> (e) the extent to which enforcement by action of either state can reasonably be expected to achieve compliance with the rule prescribed by that state.

*Id.*[3] At least one court has used the Restatement framework in determining whether the circumstances of a particular case require deference to the provisions of the Hague Convention in lieu of the Federal Rules. *See Compagnie Francaise D'Assurance Pour le Commerce Extérieur v. Phillips Petroleum Co.*, 105 F.R.D. 16, 28–32 (S.D.N.Y.1984).

Similar considerations were incorporated into a somewhat different analytical structure by Justice Blackmun in his persuasive concurring opinion in *Société Nationale Aérospatiale.* Justice Blackmun's approach to comity analysis was advised by basic choice-of-law principles designed to accommodate the conflicting policy interests of different sovereigns. Justice Blackmun argues that in determining whether considerations of comity counsel use of the Hague Convention in the first instance, a court "should perform a tripartite analysis that considers the foreign interests, the interests of the United States, and the mutual interests of all nations in a smoothly functioning international legal regime." 107 S.Ct. at 2562 (Blackmun, J., concurring in part and dissenting in part) (footnote omitted). The major distinction between the approach advocated by Justice Blackmun and that taken by the Restatement seems to be the emphasis given to the interests of the individual litigants. Those individual interests seem to be deemphasized by Justice Blackmun except to the extent that they are subsumed by the interests of the sovereigns involved, while they are given greater weight by the Restatement. This court believes that because the policy considerations involved when a court decides whether the provisions of the Hague Convention should be utilized or ignored in a particular case transcend the interests of the individual litigants in that case, the framework offered by Justice Blackmun is preferred.

The first prong of Justice Blackmun's "tripartite analysis" requires the court to weigh the foreign interests implicated by plaintiffs' desire to proceed with discovery under the Federal Rules rather than the Convention. In the present case, those interests are particularly compelling. When discovery is sought from citizens within the borders of a civil law country such as West Germany, the use of the discovery devices of the Federal Rules necessarily is more offensive to the sovereign interests of that country than would be the case if the same procedures were utilized in seeking discovery from a citizen of a common law country that is a signatory to the Convention, such as the United Kingdom.

> The act of taking evidence in a common-law country from a willing witness, without compulsion and without a breach of the peace, in aid of a foreign proceeding, is a purely private matter, in which the host country has no interest and in which its judicial authorities have normally no wish to participate. To the contrary, the same act in a civil-law country may be a public matter, and may constitute the performance of a public judicial act by an unauthorized foreign person. It may violate the "judicial sovereignty" of the host country, unless its authorities participate or give their consent.

*Société Nationale Aérospatiale*, 107 S.Ct. at 2563 (Blackmun, J., concurring in part and dissenting in part) (quoting 8 Int'l Legal Materials 785, 806 (1969)). Evidence gathering by a private party from even a willing citizen is especially objectionable to West Germany, since use of American dis-

---

**3.** In a more recent revision of the Restatement, the drafters more specifically addressed some of the concerns relevant when courts located in the United States consider whether to order foreign discovery through procedures found objectionable by the sovereign within which the evidence sought is located:

    (1) the importance to the ... litigation of the documents or other information requested;
    (2) the degree of specificity of the request;
    (3) whether the information originated in the United States;

    (4) the availability of alternative means of securing the information; and
    (5) the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located.

Restatement of Foreign Relations Law of the United States (Revised) § 437(1)(c) (Tent.Draft No. 7, 1986) (approved May 14, 1986).

covery procedures can violate rights protected by that nation's constitution. Justice Blackmun specifically noted that explicit in the rules governing discovery in West Germany "is a constitutional principle of proportionality, pursuant to which a judge must protect personal privacy, commercial property, and business secrets. Interference with these rights is proper only if 'necessary to protect other persons' rights in the course of civil litigation.' " 107 S.Ct. at 2563 (citation omitted).

The diplomatic problems created by the use of the discovery provisions of the Federal Rules within the borders of West Germany—which constitute nothing less than a violation of West Germany's internal laws by outsiders with the approval and support of American courts—are largely diminished when the procedures of the Hague Convention are utilized. Though the Convention contemplates the taking of evidence within West German borders by individuals who are not judicial officers of West Germany, that nation's consent to the use of Convention procedures reduces the danger of offending West Germany's sovereign interests. The "classic view" of territorial sovereignty was summarized by Chief Justice Marshall in 1812, during a period in which our nation better understood the resentment that results when a more powerful nation shows disrespect for the sovereign integrity of a weaker state:

> The jurisdiction of the nation within its own territory is necessarily exclusive and absolute. It is susceptible of no limitation not imposed by itself.... All exceptions, therefore, to the full and complete power of a nation within its own territories, must be traced up to the consent of the nation itself.

*The Schooner Exchange v. McFaddon,* 11 U.S. (7 Cranch) 116, 136, 3 L.Ed. 287 (1812). Though this unqualified description of absolute national sovereignty is not completely consistent with modern perceptions, which have been influenced by the realities of modern international commercial trade, the fact that West Germany has consented to the Hague Convention procedures nonetheless weighs heavily in favor of the use of those procedures in the first instance.

Turning to the interests of the United States, clearly the most important is ensuring that parties in lawsuits brought in its courts have at their disposal effective discovery procedures, since such procedures facilitate a just resolution of disputes between parties. Further, the United States has a strong interest in assuring that foreign citizens and corporations doing business here can be held answerable for their conduct in American courts. *See Murphy v. Reifenhauser KG Maschinenfabrik,* 101 F.R.D. 360, 363 (D.Vt.1984). This court believes that the burden should be placed on the party opposing the use of Convention procedures to demonstrate that those procedures would frustrate these interests. Plaintiffs have not sustained that burden in the present case.

It appears that the major obstacle to the effective use of Convention procedures by litigants and the courts is the fact that we are less familiar with those procedures than with the discovery provisions of the Federal Rules. Consequently, use of Convention procedures will, at least initially, result in greater expenditures of time and money for attorneys pursuing causes of action against foreign parties on behalf of their clients and could require an increased commitment of judicial resources. Nonetheless, these inconveniences alone do not outweigh the important purposes served by the Hague convention. Further, as judges and lawyers become more familiar with the discovery rules of the Convention, it is quite possible that its procedures will prove just as effective and cost-efficient as those of the Federal Rules.[4] To assume that the "American" rules are superior to those procedures agreed upon by the signatories of the Hague Convention without first seeing how effective Convention procedures will

---

**4.** Indeed, discovery under the Federal Rules is *so* liberal that the costs of litigation may be increased rather than reduced by the use of the Federal Rules, since litigants in this country are commonly flooded with irrelevant documents and information obtained through broad discovery requests and often must expend substantial resources to have attorneys and experts wade through them.

be in practice would reflect the same parochial biases that the Convention was designed to overcome.

Plaintiffs question whether use of the Convention procedures will yield adequate results. Particularly problematical is the fact that upon ratifying the Hague Convention the West German government chose to exclude, pursuant to Article 33 of the Convention, the application of Chapter II insofar as it allows for the gathering of evidence from West German nationals by diplomatic officers or consular agents within West German borders. Further, West Germany has declared, pursuant to Article 23 of the Convention, that it will not execute letters of request for documents. Neither of these limitations would seem to affect the type of discovery at issue in the case at bar, since plaintiffs seek answers to interrogatories, not the deposition of German nationals or the turnover of documents. Moreover, even if deposition or documentary evidence were sought, it is not clear that the use of Hague Convention procedures would prove fruitless. West Germany has not foreclosed the taking of evidence by duly-appointed commissioners. Further, though the German government continues to adhere to its unqualified Article 23 declaration, it has drafted new regulations permitting "pretrial production of specified and relevant documents in response to letters of request." *Société Nationale Aérospatiale,* 107 S.Ct. at 2566 n. 22 Blackmun, J., concurring in part and dissenting in part) (citation omitted). Finally, should the use of Convention procedures yield unsatisfactory results, this court retains the power to compel discovery through the procedures outlined in the Federal Rules. *Société Internationale v. Rogers,* 357 U.S. at 204–06, 78 S.Ct. at 1091–93; *Société Nationale Aérospatiale,* 107 S.Ct. at 2554–55. This should reduce the likelihood that foreign litigants would attempt to frustrate the efforts of their adversaries to obtain discovery necessary for adequate preparation for trial.

The United States also has an interest in assuring that all parties to lawsuits in its courts are treated fairly and equally. If plaintiffs are forced to use Convention procedures while HPG can seek discovery under the Federal Rules, the possibility that HPG could gain a discovery advantage exists. However, this court is vested with extensive "discretionary powers to control discovery in order to ensure fairness to both parties." *Société Nationale Aérospatiale,* 107 S.Ct. at 2567 (Blackmun, J., concurring in part and dissenting in part). The court may "make any order which justice requires" in limiting discovery. Fed.R.Civ.P. 26(c). The court, if justice requires, can compel discovery from HPG pursuant to the Federal Rules if the use of the Convention's provisions leaves plaintiffs at an unfair disadvantage. In light of the delicate concerns at stake when discovery is sought in a foreign country, the court expects that the parties will be especially vigilant in proceeding in the spirit of cooperation and will not attempt to use accommodation of the sovereign interests of West Germany as a pretext for gaining a tactical advantage in this lawsuit. If this expectation is not fulfilled, of course, the court reserves the power to utilize all tools at its disposal to correct any inequity. Therefore, the court concludes that the interest of the United States in ensuring the fair and equal treatment of the litigants in its courts will not be compromised by requiring plaintiffs to resort in the first instance to Hague Convention procedures.

The third consideration informing Justice Blackmun's analysis of the circumstances under which comity favors the use of Convention procedures is the mutual interest of all nations in a "smoothly functioning international legal regime." *Id.* at 2562. Whenever procedures are available that can accomplish the ends sought without violating the laws of another sovereign nation, use of those procedures "fosters international cooperation and encourages reciprocity, thereby promoting predictability and stability through satisfaction of mutual expectations." *Laker Airways, Ltd. v. Sabena, Belgian World Airlines,* 731 F.2d 909, 937 (D.C.Cir.1984) (Wilkey, J.). This in turn encourages international commercial activity as well as promotes "the international legal ties that advance the rule of

law within and among nations." *Id.* Use of Hague Convention procedures in lieu of the Federal Rules when discovery is sought in a civil law country like West Germany will in nearly every instance promote "the development of an ordered international system." *Société Nationale Aérospatiale,* 107 S.Ct. at 2567 (Blackmun, J., concurring in part and dissenting in part). The perception that American courts are insensitive to the judicial sovereignty of civil law nations can be avoided, and foreign resentment of the United States, which carries with it "the predictable long-term political cost that cooperation will be withheld in other matters," *id.* at 2568, can be minimized.

In sum, application of the analytical structure suggested by Justice Blackmun clearly favors the use of Hague Convention procedures in the present case. As noted above, Justice Blackmun's approach emphasizes national interests over the concerns of individual litigants. Other authorities appear to give greater weight to such individual interests. The Restatement (Second) of Foreign Relations Law of the United States, for instance, stresses "the extent and the nature of the hardship" that would result from the application of the Convention's rules in lieu of other available procedures. *Id.* at § 40(b). A majority of the Supreme Court in *Société Nationale Aérospatiale* noted that trial courts should be guided by their "knowledge of the [particular] case and of the claims and interests of the parties" as well as the interests of the governments affected when deciding whether the discovery provisions of the Hague Convention or of the Federal Rules should be utilized. 107 S.Ct. at 2556; *see also id.* at 2555 n. 28 (quoting Restatement of Foreign Relations Law of the United States (Revised) § 437(1)(c) (Tent.Draft No. 7, 1986) (approved May 14, 1986)) (*see supra* n. 3). Even if the interests of affected individuals were given greater emphasis in the calculus of comity analysis in the present case, however, the court would still conclude that use of Convention procedures in the first instance is preferred.

Given the scope of plaintiffs' interrogatories and HPG's objections to many of them on various grounds, *see supra* n. 1, it is not at all clear that use of Convention procedures will be much more costly or time consuming than would the direct use of the Federal Rules. In addition, it appears that plaintiffs can obtain most if not all of the information they seek in their interrogatories through Convention procedures. The inconvenience that results when unfamiliar procedures must be used to obtain evidence located abroad does not unfairly prejudice plaintiffs in this case, while use of the Federal Rules could require HPG to violate the privacy rights of individuals protected by West German law. Under all the circumstances, use of Convention procedures seems desirable.

### III. CONCLUSION

HPG's motion for a protective order requiring plaintiffs to serve their interrogatories in accordance with the terms of the Hague Convention is granted.

It is so Ordered.